IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

| | | |
|---|---|---|
| THE BOARD OF DIRECTORS OF | : | CIVIL ACTION |
| SAPPHIRE BAY CONDOMINIUMS | : | |
| WEST | : | No. 04-62 |
| | : | |
| v. | : | |
| | : | |
| GEORGE R. SIMPSON, Individually, | : | |
| and d/b/a NORTH AMERICAN | : | |
| ALLIANCE FOR HONEST | : | |
| CORPORATE MANAGEMENT | : | |

## MEMORANDUM

**Juan R. Sánchez, J.**                                                                 **August 13, 2014**

Plaintiff Board of Directors of Sapphire Bay Condominiums West (the Board) has operated as a condominium association in the Virgin Islands since 1969 under the trade name "Sapphire Bay Condominiums West." Defendant George R. Simpson purchased a condominium at Sapphire Bay in 2003. Following a dispute with the Board, Simpson erected a series of "gripe sites" criticizing the Board, its members, and its attorney. In 2004, the Board filed the instant action alleging violations of the Lanham Act and analogous common law claims. The Board seeks to enjoin Simpson permanently from using the domain names associated with the gripe sites and also seeks compensatory and punitive damages.

After holding a bench trial on the merits, the Court concludes Simpson's websites are or were not commercial in nature as required to find liability under the Lanham Act, but even if they were, the Board's claims still fail because it did not show that its mark is famous or that the websites cause or caused a likelihood of confusion or actual deception. The Board's related common law claims fail for similar reasons. As a result, the Court must deny the Board's requests for injunctive relief and damages and enter judgment in favor of Simpson on all counts.

Pursuant to Federal Rule of Procedure 52(a), the Court issues the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

1. The Board has operated as a condominium association in the Virgin Islands since 1969 and has used the trade name Sapphire Bay Condominiums West since that time.

2. In July 2003, Simpson purchased Unit C-4 at Sapphire Bay Condominiums West.

3. After residing there for some time, Simpson made a request to the Board to modify his condominium windows. Simpson did not receive an answer from Board within 30 days and thus proceeded to make the modifications on his own.

4. In an attempt to reverse Simpson's modifications, the Board commenced an action against him in the Superior Court of the Virgin Islands (then known as the Territorial Court of the Virgin Islands). Simpson ultimately prevailed.

5. By April 2004, Simpson registered the domain name "sapphirebaycondos.com" under his own name and operated under that domain name a website purporting to be "The Official Website of Sapphire Bay Condominiums West – St Thomas, VI." The website contained critical and inflammatory remarks about the Board, its members, and its attorney. For instance, directly beneath the website's slogan was the phrase "'I don't give a damn' management," and the home page contained subpage hyperlinks including language such as "Lawyer Lies and Five Board Members Commit a Crime."

6. In May or June of 2004, Simpson transferred the domain name sapphirebaycondos.com to a business entity named North American Alliance for Honest Corporate Management.

7. On May 20, 2004, the Board sent Simpson a cease and desist letter objecting to his use of its trade name in his domain name and on his website. Shortly thereafter, and prior to the

commencement of this suit, Simpson rebranded the website as "The *Owners Official Website* For the Elimination of Dishonesty on the Board of Directors of Sapphire Bay Condominiums West, St Thomas, VI."[1]

8.  On June 2, 2004, the Board initiated the instant action against Simpson, alleging willful Lanham Act violations, violations of the Virgin Islands Similar Trade Prohibition Act, deceptive trade practices, and the common law torts of unfair competition, anti-dilution, trademark infringement, tortious interference, and misappropriation.

9.  The Board filed its Amended Complaint on August 4, 2004, which also alleged a violation of the Anticybersquatting Consumer Protection Act, but that claim was later orally withdrawn during the bench trial. *See* Trial Tr., 67:5-6, June 14, 2013.

10. On June 18, 2004, Simpson registered the trade names "Sapphire Bay West," "Sapphire Bay West Condos," "Sapphire Bay Condos West," "Sapphire Bay Condominiums West," "Sapphire Beach Condominiums West," and "Sapphire Beach West" with the Corporations and Trademark Division of the Office of the Lieutenant Governor of the Virgin Islands. The registrations were revoked in late July 2004 because they were already registered or were similar to trade names already registered to Bay Resorts, Inc.[2]

11. On August 10, 2004, the district court issued a preliminary injunction enjoining Simpson, individually and doing business as North American Alliance for Honest Corporate

---

[1] Simpson maintains he is unaffiliated with North American Alliance for Honest Corporate Management, and he forwarded the cease and desist letter to the company, which in turn altered the website's slogan. This Court finds Simpson operated and directed North American Alliance for Honest Corporate Management at all relevant times, and the Court will refer to the company and Simpson as "Simpson," as the two are interchangeable.

[2] Bayside Resorts, Inc. is unaffiliated with the Board. Bayside did, however, by letter of July 20, 2004, grant the Board permission to register with the Corporations and Trademark Division of the Office of the Lieutenant Governor the names "Sapphire Bay West" and "Sapphire Bay Condos West." The Board registered these names on August 19, 2004.

Management, from using sapphirebaycondos.com, or any derivative thereof, as a domain name for any website under his ownership or substantial control. The injunction also ordered Simpson to cancel the domain name sapphirebaycondos.com and to remove it from the registry of domain names maintained by Network Solutions. The Court also ordered Simpson to cease and desist from representing himself as the owner of the names "Sapphire Bay West," "Sapphire Bay West Condos," "Sapphire Bay Condos West," "Sapphire Bay Condominiums West," "Sapphire Beach Condominiums West," and "Sapphire Beach West" and any derivation thereof.

12. On August 17, 2004, Simpson took down the website and deregistered the domain name sapphirebaycondos.com.

13. Shortly thereafter, Simpson erected virtually the same website under the domain name "usvicondos.com," which has been operating continuously ever since.[3]

14. Simpson appealed the issuance of the preliminary injunction to the United States Court of Appeals for the Third Circuit, which affirmed the district court. *Bd. of Dirs. of Sapphire Bay Condos. W. v. Simpson*, 129 F. App'x 711, 715 (3d Cir. 2005).

## DISCUSSION

In its Amended Complaint, the Board only alleged that the website under the domain name sapphirebaycondos.com violated the Board's trademark and trade name rights. During the bench trial, however, the Board sought to prove trademark violations for the websites located under the domain names sapphirebaycondos.com and usvicondos.com, respectively. The Board

---

[3] Simpson also maintains a man named "Randolph Lindsay" operates and controls the website. Simpson admits he has contributed content to the website, but claims he has never met Lindsay and has only corresponded with him via email. However, reviewing the evidence, this Court finds Simpson and Lindsay are one in the same, and it is Simpson who maintains control of usvicondos.com. Nevertheless, the Court's analysis is not impacted by who actually controls the website under the domain name usvicondos.com.

also wants the preliminary injunction made permanent and expanded to include usvicondos.com. Although the Board did not further amend its complaint to assert claims related to usvicondos.com, it appears to be pursuing all of the same claims it asserted in connection with Simpson's previously used domain name, sapphirebaycondos.com.  This Court will therefore analyze all claims with respect to the content under both domain names (including the domain names themselves).

## I.     LANHAM ACT CLAIMS

### A.     Unfair Competition and False Advertising

The Board alleges Simpson violated § 43(a)(1) of the Lanham Act, codified at 15 U.S.C. § 1125(a)(1). Section 1125(a)(1) provides:

> Any person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1). Section 1125(a) thus creates two distinct bases of liability: unfair competition,[4] § 1125(a)(1)(A), and false advertising, § 1125(a)(1)(B). *Lexmark Int'l, Inc. v.*

---

[4] This form of unfair competition is also sometimes referred to as "false association" or "false designation." *See, e.g.*, *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1384 (2014); *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1443-44 (3d Cir. 1994).

*Static Control Components, Inc.,* 134 S. Ct. 1377, 1384 (2014). The Board broadly referenced § 1125(a)(1) in its Amended Complaint and incorporated language from both 1125(a)(1)(A) and 1125(a)(1)(B) without specifying a cause of action. Because the Board has not clarified the specific statutory basis of liability for its Lanham Act claim, this Court will analyze the claim under each subsection.

### 1. Commercial Use

As a threshold matter, this Court must determine whether or not Simpson's websites are commercial, because the Lanham Act only regulates commercial speech. *See Valley Forge Military Acad. Found. v. Valley Forge Old Guard, Inc.*, No. 09-2373, 2014 WL 2476115, at *3 (E.D. Pa. June 2, 2014) (citing *Taubman Co. v. Webfeats*, 319 F.3d 770, 774 (6th Cir. 2003)); *see also Farah v. Esquire Magazine,* 736 F.3d 528, 541 (D.C. Cir. 2013) ("Every circuit court of appeals to address the scope of [15 U.S.C. § 1125] has held that [its provisions] apply only to commercial speech.").[5]   In determining whether speech is commercial for the purposes of the Lanham Act, the Third Circuit considers: (1) whether the speech is an advertisement; (2) whether the speech refers to a specific product or service; and (3) whether the speaker has an economic motivation for the speech. *Facenda v. N.F.L. Films*, *Inc.*, 542 F.3d 1007, 1017 (3d Cir. 2008) (citing *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.,* 898 F.2d 914, 933 (3d Cir. 1990)). "Stated succinctly, the commercial speech doctrine rests heavily on the common sense distinction between speech proposing a commercial transaction . . . and other varieties of

---

[5] Section 1125(a)(1), in particular, prohibits any person who "in connection with any goods or services . . .  uses in commerce any word, term, name, symbol, or device, or any combination thereof" is likely to cause confusion or mistake as to the origin of the goods or services. 15 U.S.C. § 1125(a)(1). Because § 1125(a)(1) requires a connection with goods or services, claims under this section are subject to what is "commonly described as the commercial use requirement." *Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research*, 527 F.3d 1045, 1051-52 (10th Cir. 2008).

speech." *Blue Cross*, 898 F.2d at 933 (quoting *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 637 (1985)) (internal quotation marks omitted).

Simpson contends his websites are not commercial and contain only protected noncommercial speech, and therefore are beyond the reach of the Lanham Act. The Board does not allege that Simpson's websites are commercial because they sell or sold goods or services, but because the websites economically injured and continue to injure the Board. Applying the *Facenda* factors, the Court finds that Simpson's websites do not or did not contain commercial speech. First, the websites have not advertised any goods or services. Second, the websites do not refer to a specific product or service provided by Simpson. The websites contain sensationalized "articles" alleging, among other things, that various past and present board members have been involved in a number of corruption schemes. Third, Sapphire Bay has not shown Simpson's speech was economically motivated. While Simpson concedes that the purpose of the websites is to attack the Board, there is no evidence that the speech was motivated to economically benefit Simpson or a competitor of the Board's. *See United States v. Bell*, 414 F.3d 474, 479 (3d Cir. 2005) (defining commercial speech as expression related to the economic interests of the *speaker* and its audience) (emphasis added) (citing *Blue Cross,* 898 F.2d at 933).

The Board argues because the district court concluded Simpson's speech was commercial when issuing a preliminary injunction against Simpson, this Court should come to the same conclusion. However, "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Moreover, the standard for a preliminary injunction is a likelihood of success at trial on the merits. *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 192 (3d Cir. 1990). Because a party is not required to prove its

full case at a preliminary injunction hearing, "the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits . . . ." *Camenisch*, 451 U.S. at 395 (citations omitted). The record before this Court, as developed during trial, does not establish that Simpson's websites were or are connected with goods or services or that Simpson has engaged in commercial speech.[6]

The Third Circuit has not decided whether the use of another's trademark in connection with a noncommercial gripe site violates the Lanham Act, but a number of other circuits have found no violation in circumstances similar to those presented in this case. *See, e.g.*, *Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research*, 527 F.3d 1045, 1051-54 (10th Cir. 2008) (finding no Lanham Act violation where the defendant used the plaintiff's trademark as the domain name of a website critical of the plaintiff because the website was noncommercial); *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 676-80 (9th Cir. 2005) (same); *Taubman Co.*, 319 F.3d  at 775 (same); *Lamparello v. Falwell*, 420 F.3d 309, 318 (4th Cir. 2005) (finding no Lanham Act violation where the defendant used a mark similar to the plaintiff's as a domain name of a noncommercial website critical of the plaintiff because there was no

---

[6] In granting the preliminary injunction, the district court relied in part on *Jews For Jesus v. Brodsky*, in which the court found commercial use where the defendant used the domain name "www.jewsforjesus.com" to host a website critical of the Jews for Jesus religious organization. 993 F. Supp. 282 (D.N.J. 1998) *aff'd*, 159 F.3d 1351 (3d Cir. 1998). However, key to the court's reasoning was that the website contained a hyperlink diverting visitors to an organization offering competing goods and services. *Id*. at 309. While Simpson's website contains hyperlinks, none of them divert visitors to any website connected with goods or services. The district court also relied on *Planned Parenthood Federation of America, Inc. v. Bucci*, in which the defendant erected a website using the domain name "www.plannedparenthood.com" to promote an anti-abortion book. No. 97-0629, 1997 WL 133313 (S.D.N.Y. Mar. 24, 1997), *aff'd*, 152 F.3d 920 (2d Cir. 1998). Though the website did not sell the book, the court found it served a commercial purpose because its contents were "similar to a publisher's publicity kit" and related to the "advertisement and distribution" of the book. *Id*. at *7. Simpson's sites do not advertise any product.

likelihood of confusion).  Accordingly, this Court concludes because Simpson's websites are and were noncommercial, the Board's Lanham Act claims fail. However, even if Simpson's websites are or were commercial, the Board's claims still fail for other reasons discussed below.

### 2.      Unfair Competition

To establish a claim for unfair competition under the Lanham Act, a plaintiff must prove three elements: "(1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion." *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,* 237 F.3d 198, 210 (3d Cir. 2000).[7]  Even if Simpson's websites were or are commercial, the Board must prove they caused or cause a likelihood of confusion. *See Falwell*, 420 F.3d at 314 ("[T]he use of a competitor's mark that does not cause confusion as to source is permissible.") (citation and internal quotation marks omitted). As the Third Circuit explained in *Facenda*, "the Lanham Act customarily avoids violating the First Amendment, in part by enforcing a trademark *only* when consumers are likely to be misled or confused by the alleged infringer's use." 542 F.3d at 1018 (emphasis added); *see also Prestonettes, Inc., v. Coty*, 264 U.S. 359, 368 (1924) ("A trade-mark only gives the right to prohibit the use of it so far as to protect the owner's good will against the sale of another's product as his.").

In determining the likelihood of confusion as to the source of services, the Third Circuit employs a ten-factor test, known as the *Lapp* factors. *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 473 (3d Cir. 1994) (employing the factors set forth in *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 462-63 (3d Cir. 1983)). These factors are:

---

[7] Simpson does not dispute that the Board owns the trademark Sapphire Bay Condominiums West, or that it is valid and legally protected mark.

(1) degree of similarity between the owner's mark and the alleged infringing mark;

(2) the strength of the owner's mark;

(3) the price of the goods or services and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) the length of time the defendant has used the mark without evidence of actual confusion arising;

(5) the intent of the defendant in adopting the mark;

(6) the evidence of actual confusion;

(7) whether the goods or services, whether or not competing, are marketed through the same channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties' sales efforts are the same;

(9) the relationship of the goods or services in the minds of consumers because of the similarity of function; and

(10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

*A & H*, 237 F.3d at 211.[8] "None of these factors is determinative in the likelihood of confusion analysis and each factor must be weighed and balanced one against the other." *Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 182-83 (3d Cir. 2010) (citation and internal quotation marks omitted). A district court may find some of the factors are inapplicable or unhelpful in some cases, but the court still must explain why it did not employ those factors. *Id*. at 183.

Simpson has operated three distinct websites that must be analyzed. The first is the website Simpson operated under the domain name sapphirebaycondos.com with the slogan "The Official Website of Sapphire Bay Condominiums West – St Thomas, VI" from April 2004 until

---

[8] These factors are applied whether or not the underlying goods or services compete. *A & H*, 237 F.3d at 212-15.

late May 2004 (Website One).[9] The second is the website Simpson operated under the domain name sapphirebaycondos.com with the slogan "The *Owners Official Website* For the Elimination of Dishonesty on the Board of Directors of Sapphire Bay Condominiums West, St Thomas, VI" from late May 2004 until mid-August 2004 (Website Two). The last is the website Simpson started in mid-August 2004 (Website Three) and continues to operate under the domain name usvicondos.com with the same slogan as Website Two. Of the ten *Lapp* factors, all but the first and fifth factors can be applied to the websites collectively. After analyzing the second, third, fourth, sixth, seventh, eighth, ninth, and tenth factors as applied to all three websites, the Court will analyze the first and fifth factors as they apply to the websites individually.

       **a.**      **Strength of the Mark (*Lapp* Factor Two)**

A mark's strength is measured by "(1) the distinctiveness or conceptual strength of the mark; and (2) the commercial strength or marketplace recognition of the mark. The first prong of this test looks to the inherent features of the mark; the second looks to factual evidence of marketplace recognition." *A & H*, 237 F.3d at 221 (citations and internal quotation marks omitted). Conceptual strength of a mark is "often associated with the particular category of 'distinctiveness' into which a mark falls (i.e., arbitrary, suggestive, or descriptive) . . . ." *Id.* at 222.

The Board's trademark is descriptive. "Sapphire Bay" describes the geographic location of the condominiums, and "West" describes either the condominiums in relation to Sapphire Bay

---

[9] The Amended Complaint repeatedly asks for damages and an injunction enjoining and restraining Simpson from using the names "Sapphire Bay Condominiums West" and/or "the official website of Sapphire Bay West – St. Thomas, VI." *See* Am. Compl. ¶¶ 19, 25, 30, 34, 38, 41, 42, 44, 46, 48, & 52. Though Simpson argues his use of Website One is not actionable because he stopped using it prior to the filing of this case, the claim is not rendered moot. *See* Answer ¶¶ 23-26; *Century 21 Real Estate Corp. v. Lendingtree, Inc.*, 425 F.3d 211, 217 (3d Cir. 2005) (holding in an injunctive relief case that the defendant's voluntary cessation of activities allegedly infringing on the plaintiff's trademark did not render the case moot).

or other condominiums. The name is neither suggestive nor arbitrary. As to the second prong, the Board has been using its trade name for over forty years. However, the Board has not submitted any evidence regarding the marketplace recognition of its trade name. For instance, the Board has presented no evidence concerning the amount of money it has spent on advertising or if it has advertised at all, or whether the public recognizes its mark. Considering these two prongs together, the Court concludes the Board has a weak mark. Accordingly, the second factor weighs against a finding of likelihood of confusion.

### b.    Purchaser's Care and Sophistication (*Lapp* Factor Three)

"Inexpensive goods require consumers to exercise less care in their selection than expensive ones. The more important the use of a product, the more care that must be exercised in its selection." *McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 364 (3d Cir. 2007) (quoting *Versa Products Co., Inc. v. Bifold Co. (Mfg.) Ltd.*, 50 F.3d 189, 204-05 (3d Cir. 1995)).   The price of a good or service is indicative of the care and attention expected of ordinary consumers when making a purchase, and "the greater the care and attention, the less the likelihood of confusion." *Fisons*, 30 F.3d at 476 n.12. No one would dispute that buying or renting a condominium requires sophistication and attention. Nancy Giges, former president of the Board, testified that her husband was careful to perform his own due diligence prior to purchasing their condominium. Trial Tr., 28:24-29:7, June 13, 2013. Board member Michelle Garcia also testified that her Sapphire Bay condominium was appraised at $255,000. Trial Tr., 10:13, June 14, 2013. Due to the high price of renting or purchasing a condominium and the sophistication involved, this factor weighs against a finding of likelihood of confusion.

### c.    Actual Confusion (*Lapp* Factors Four & Six)

Simpson began operating all of the websites in 2004, and has operated Website Three for approximately ten years. The Board has presented no evidence of actual confusion at any point during which any of the websites have operated. Nancy Giges testified that the websites have caused some potential condominium purchasers to be reluctant to buy and that some renters have asked about the websites, but neither she nor any other witness testified on the point of consumer confusion. Trial Tr., 45:8-12, June 13, 2013. Accordingly, these factors weigh against a finding of likelihood of confusion.

####    d.    Marketing and Advertising Channels (*Lapp* Factors Seven & Eight)

Simpson has maintained an Internet presence that provided or provides information regarding the Board. The Board has not presented any evidence regarding how it markets its services. While the Board argues a Google search of the trade name "Sapphire Bay Condominiums West" first returns Simpson's Website Three, the Board failed to mention only thirty-three results are generated from searching this term.[10] Of those thirty-three results, over half are related either to this litigation or websites operated by Simpson. The Board does not allege (and did not prove) it has a website or any commercial advertisements on the Internet. Many, if not all, of the remaining Google search results direct users to third-party generated content providing information about Sapphire Bay Condominiums West. Accordingly, the seventh factor weighs against a finding of likelihood of confusion. Because Simpson does not sell and has not sold anything on his websites, the eighth factor is inapplicable in this case.

####    e.    The Relationship of the Goods or Services and Plans to Enter the Market (*Lapp* Factors Nine & Ten)

Either through the Board or the individual owners, the Board facilitates rental and real estate services and also provides maintenance services for its condominiums. Simpson, through

---

[10] These results are current as of August 6, 2014.

his websites, offers criticism of the Board and its services. The Board has presented no evidence that consumers think or are likely to think that any of Simpson's websites, whether characterized as "Official" or not, provide condominium rental, real estate, or maintenance services. Accordingly, factor nine weighs against a finding of likelihood of confusion. The tenth factor is inapplicable. There are no facts suggesting the consuming public might expect Sapphire Bay Condominiums West to offer a service critical of itself or that it is likely to.

### f.      Similarity of the Marks and Defendant's Intent (*Lapp* Factors 1 & 5)

Website One used the domain name sapphirebaycondos.com, which is very similar to "Sapphire Bay Condominiums West." Website One also contained the phrase "The Official Website of Sapphire Bay Condominiums West – St Thomas, VI," which not only contained the Board's mark in its entirety but also suggested the Board sponsored the website. Accordingly, factor one weighs in favor of a finding of likelihood of confusion with respect to Website One.

Website Two also operated under the domain name sapphirebaycondos.com, but it used the phrase "The *Owners Official Website* For the Elimination of Dishonesty on the Board of Director of Sapphire Bay Condominiums West, St Thomas, VI" in place of the earlier phrase "The Official Website of Sapphire Bay Condominiums West – St Thomas, VI."  The Board's mark and the slogan on Website Two are vastly dissimilar. While Website Two's slogan contains the Board's trade name, the phrase read in its entirety denotes an entity or organization diametrically opposed to the Board. Accordingly, factor one weighs against a finding of likelihood of confusion with respect to Website Two.

Website Three uses the domain name usvicondos.com, which is not at all similar to "Sapphire Bay Condominiums West," and the Board does not argue it is. Like Website Two, Website Three contains the phrase "The *Owners Official Website* For the Elimination of

Dishonesty on the Board of Director of Sapphire Bay Condominiums West, St Thomas, VI." For the reasons discussed above, factor one weighs against a finding of likelihood of confusion with respect to Website Three.

With regard to Simpson's intent, there is no question he erected the websites with the intent to attack the Board. Trial Tr., 72:3-7, June 14, 2014. By characterizing Website One as "The Official Website of Sapphire Bay Condominiums West – St Thomas, VI," along with using the domain name, he also intended to use the Board's mark as if it were his own. Accordingly, factor five weighs in favor of a finding of likelihood of confusion with respect to Website One.

As for Website Two, Simpson still used an intentionally confusing domain name to draw what would presumably be the Board's customers. However, after receiving the cease and desist letter, Simpson changed the slogan such that Website Two made it clear it was not officially sanctioned by the Board. Considering Simpson's intent with respect to Website Two in full context, factor five weighs neither in favor of nor against a finding of likelihood of confusion. Because Simpson ultimately changed the domain name to usvicondos.com, factor five weighs against a finding of likelihood of confusion with respect to Website Three.

g.      **Weighing the *Lapp* Factors**

Weighing the factors together, the Court finds no likelihood of confusion. Simpson's websites could not possibly mislead or have misled consumers. Since receiving the Board's cease and desist letter, Simpson has characterized the websites as "The *Owners Official Website* For the Elimination of Dishonesty on the Board of Directors of Sapphire Bay Condominiums West, St Thomas, VI." No consumer could reasonably believe the Board is promoting rental or real estate services through self-effacing websites. This was true even when Simpson characterized the website as "The Official Website of Sapphire Bay Condominiums West – St

Thomas, VI" under the domain name sapphirebaycondos.com. For instance, Website One described the Board as providing "'I don't give a damn' management." It featured a prominent picture of what presumably is the Board's flooded parking lot, and the website contained links to stories including text such as "SBCW Board Members . . . Could Go to Jail for Obstruction of Justice. . ." No reasonable consumer would believe the Board operated a website for the purpose of promoting its own malfeasance and criminal conduct. *See Parker v. Google, Inc.*, 422 F. Supp. 2d 492, 502 (E.D. Pa. 2006) (finding no consumer would believe the plaintiff erected a gripe site criticizing himself even when characterized as "official"), *aff'd*, 242 F. App'x 833 (3d Cir. 2007); *see also* 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 25:76 (4th ed.) ("Even if the accused domain name is identical to the senior user's mark, if the goods or services advertised at the Web site are sufficiently distinct from those identified by the mark, there will be no likelihood of confusion."). Therefore, even if the Court found Simpson's websites are or were commercial, which it does not, the Board's unfair competition claim still fails because the websites have not caused, nor will they cause a likelihood of confusion.

### 3.    False Advertising

To be liable for false advertising under the Lanham Act, the Board must show the commercial message or statement is either: "(1) literally false or (2) literally true or ambiguous, but has the tendency to deceive consumers." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.,* 290 F.3d 578, 586 (3d Cir. 2002) (citing *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 943 (3d Cir.1993) ("[A] plaintiff must prove either literal falsity or consumer confusion, but not both.")). "[I]n assessing whether an advertisement is literally false, a court must analyze the message conveyed in full context." *Castrol Inc.*, 987 F.2d at 946. "Where the advertisements are *not literally false,* plaintiff bears the burden of proving actual

16

deception by a preponderance of the evidence. Hence, it cannot obtain relief by arguing how consumers could react; it must show how consumers actually do react." *Id*. at 943 (quoting *Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 226 (3d Cir. 1990)).

The Board alleges Simpson has made "false and misleading statements in commercial advertising and publication to promote and further his own business and personal interest. . . ." Am. Compl. ¶ 18. While the Board does not make it clear what exactly Simpson is or was advertising, Website One did contain the literally false statement "The Official Website of Sapphire Bay Condominiums West – St Thomas, VI." The Board never authorized Simpson to operate an "official" website on its behalf. However, analyzing Website One in its full context, it contained many statements and photographs which are ambiguous or possibly literally true. For instance, Website One contained a photograph of a flooded parking lot presumably maintained by the Board. It also contained a photograph of garbage piled on what appears to be the Board's premises. Website One also contained references to the Board president's "deception," and an allegation that five Board members have committed a crime. All of these were used to establish Simpson's theme that the Board provides "'I don't give a damn' management." To the extent Website One could be construed as an advertisement, when taken into full context, these photographs, statements, criticisms, and allegations are ambiguous if not, at times, literally true.

Websites Two and Three do not even include the literally false statement "The Official Website of Sapphire Bay Condominiums West – St Thomas, VI," but instead use the phrase "The *Owners Official Website* For the Elimination of Dishonesty on the Board of Directors of Sapphire Bay Condominiums West, St Thomas, VI." This statement itself is ambiguous. It is not clear if it refers to Sapphire Bay condominium owners' official website, and collectively the owners want to eliminate dishonesty from the Board; or if it is the official website of those

particular owners who want to eliminate dishonesty from the Board. Indeed, the word "Owners" is ambiguous. It is not clear if the word as used here refers to the singular possessive (owner's), plural possessive (owners'), or just the plural form (owners) of the word "owner." If construed as taking the singular possessive form (owner's), then the statement arguably is literally true, as the website could represent condominium owner George Simpson's official website for the elimination of dishonesty on the Board. As for the content of Websites Two and Three, it is largely similar and often the same as the content of Website One.

Because the websites taken in their full context contain or contained ambiguous or possibly true statements, the Board had the burden of proving by a preponderance of the evidence that the statements are actually deceptive. The Board must show how consumers actually reacted to the websites, and it is not enough for the Board to argue how consumers could or may react. The Board has failed to produce any evidence suggesting consumers were actually deceived by the websites. Therefore, even if the Court found Simpson's websites are or were commercial, which it does not, the Board's false advertising claim would fail.

### B.    Dilution

While the Board did not specifically allege a federal dilution claim in its Amended Complaint, the district court nevertheless based its order for a preliminary injunction in part on the likelihood of success of a federal dilution claim. *See* Am. Compl.; Order, August 11, 2004, ECF No. 19. The Court will therefore address this claim.

The Lanham Act excludes dilution actions for "[a]ny noncommercial use of a mark." 15 U.S.C. § 1125(c)(3)(C). However, the Board's dilution claim fails even if Simpson's websites had made a commercial use of its mark. Section 1125(c) of the Lanham Act states in relevant part:

> Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

15 U.S.C. § 1125(c)(1).

The key requirement is that the mark be famous, which the section defines as "widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." *Green v. Fornario*, 486 F.3d 100, 105 (3d Cir. 2007) (quoting 15 U.S.C. § 1125(c)(2)(A)). "This is a rigorous standard, as it extends protection only to highly distinctive marks that are well-known throughout the country." *Id.* (citation omitted). In determining whether a mark possesses the requisite degree of recognition, the Court may consider all relevant factors, including the following:

> (i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.

> (ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.

> (iii) The extent of actual recognition of the mark.

> (iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C. § 1125(c)(2)(A).[11]

---

[11] The Court applies the standard of fame as defined by the Trademark Dilution Restoration Act of 2006 ("TDRA"), which eliminated claims based on "niche market fame" previously available under the Federal Trademark Dilution Act ("FTDA"). Under the TDRA, damages for dilution are only available for marks first used in commerce by the person against whom the injunction is sought after October 6, 2006. 15 U.S.C. § 1125(c)(5)(A). Unlike the TDRA, dilution claims made under the FTDA require a showing of actual dilution. *Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 419 (2003); *see also Dan-Foam A/S v. Brand Named Beds, LLC*, 500 F. Supp. 2d 296, 308 (S.D.N.Y. 2007) ("Because the TDRA's relaxed likelihood of dilution standard applies

The Board has not presented any evidence its mark is "widely recognized by the general consuming public of the United States." *Id.* As for the four factors, the Board has presented no evidence supporting any of them. Therefore, even if the Court found Simpson made commercial use of the Board's mark, which it does not, the Board's dilution claim would still fail because the Board did not prove its mark is famous.

## II.   VIRGIN ISLANDS CLAIMS

### A.   The Virgin Islands Similar Trade Name Prohibition Act, 11 V.I.C. § 1204

The Board alleges Simpson violated the Virgin Islands Similar Trade Name Prohibition Act. The act provides:

> A trade name registered in accordance with the provisions of this chapter shall not be the same as, nor so similar as to cause confusion with, the trade name of any person, partnership, association or corporation, foreign or domestic, doing business under such trade name in the United States Virgin Islands.

11 V.I.C. § 1204. It is not clear § 1204 provides a private cause of action. This Court has not found or been provided case law suggesting it does. However, even assuming there is a private cause of action, the trade names Simpson registered in June 2004 were cancelled by the Corporations and Trademark Division of the Office of the Lieutenant Governor of the Virgin Islands in July 2004, making injunctive relief unnecessary. To the extent the Board is seeking damages, it has failed to prove that Simpson's registration of its trade name, and derivations thereof, has caused the Board any damage whatsoever. The Board's § 1204 claim therefore fails.

---

only to pre-October 6, 2006 claims seeking prospective relief, actual dilution . . . still applies when a pre-October 6, 2006 claimant seeks monetary relief."). Because the Board has failed to present evidence of actual dilution, only injunctive relief is available, and it is proper to apply the TDRA fame standard. *See, e.g., Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 477 F.3d 765, 766 (2d Cir. 2007) (applying TDRA for injunctive relief in a dilution case filed before 2006, but decided in 2007); *see also Landgraf v. USI Film Prods.*, 511 U.S. 244, 273 (1994) ("When [an] intervening statute authorizes or affects the propriety of prospective relief, application of the new provision is not retroactive.").

### B.    Deceptive Trade Practices, 12A V.I.C. § 101

The Board also alleges Simpson committed deceptive trade practices. In the Virgin Islands, deceptive trade practices are prohibited by 12A V.I.C. § 101, which provides "[n]o person shall engage in any deceptive or unconscionable trade practice in the sale, lease, rental or loan or in the offering for sale, lease, rental, or loan of any consumer goods or services . . . ." 12A V.I.C. § 101.  A deceptive trade practice is "any false, falsely disparaging, or misleading oral or written statement, visual description or other representation of any kind made in connection with the sale, lease, rental, or loan of consumer goods or services . . . which has the capacity, tendency or effect of deceiving or misleading consumers." 12A V.I.C. § 102(a). Because a violation of the statute requires a "capacity, tendency, or effect of deceiving or misleading customers," the Third Circuit has held a claim for deceptive trade practice in the Virgin Islands is analogous to a claim under § 43(a) of the Lanham Act, which requires a likelihood of confusion. *See Island Insteel Sys., Inc. v. Waters*, 296 F.3d 200, 204 (3d Cir. 2002). As discussed earlier, the Board has failed to show Simpson's websites have caused or are likely to cause confusion, or have a capacity, tendency, or effect of deceiving or misleading consumers. Also, Simpson has not made any false or misleading representation in connection with consumer goods or services. The Board's deceptive trade practice claim therefore fails.

### C.    Common Law Claims

The Board also alleged common law claims of unfair competition, trademark infringement, anti-dilution, tortious interference, and misappropriation. Though 1 V.I.C. § 4 provides that the Restatements of Law should form the common law of the Virgin Islands unless there is a statute to the contrary, the Virgin Islands Supreme Court has ruled that the legislature implicitly repealed 1 V.I.C. § 4 in 2004 when it enacted 4 V.I.C. § 21, which established the

Virgin Islands Supreme Court. *Banks v. Int'l Rental & Leasing Corp.*, 55 V.I. 967, 2011 WL 6299025, at *3-6 (V.I. Dec. 15, 2011). The Virgin Islands Supreme Court held it may determine the common law "without automatically and mechanistically following the Restatements." *Id.* at *5. Nevertheless, this Court will employ the language of the most recent Restatements, because the Virgin Islands Supreme Court has noted "that a strong preference exists for following the most recent Restatement over an older version" and this Court is unaware of any statutes or Virgin Islands Supreme Court precedent requiring it to deviate from the most recent Restatements. *Id.* at *6.

### 1.    Unfair Competition

The Board broadly alleged Simpson engaged in unfair competition by passing off his website as the Board's and in doing so was "falsely deceiving the public and business marketplace." *See* Am. Compl. ¶ 27. The language suggests a cause of action under § 2 of the Third Restatement of Unfair Competition, which provides:

> One who, in connection with the marketing of goods or services, makes a representation relating to the actor's own goods, services, or commercial activities that is likely to deceive or mislead prospective purchasers to the likely commercial detriment of another under the rule stated in § 3 is subject to liability to the other for the relief appropriate under the rules stated in §§ 35- 37.

Restatement (Third) of Unfair Competition § 2 (1995). The language of § 2 strongly resembles the language of § 1125(a) of the Lanham Act, and the comments illustrate that § 1125(a) provides a basis for § 2's parameters. *Id.* cmts. b, c, & f. Comment d puts forth a test for determining the tendency of a representation to deceive or mislead that is nearly identical to the test for false advertising under § 1125(a)(1)(B) of the Lanham Act. *Id.* cmt. d. Because the Court found the Board's federal false advertising claim would fail even if Simpson's websites were commercial, the Court finds the Board's common law unfair competition claim fails as well.

### 2.    Trademark Infringement and Anti-dilution

Under the Third Restatement, trademark infringement requires a "likelihood of confusion."[12] *Id*. § 20. The Third Restatement's standard for finding a likelihood of confusion is almost identical to the Third Circuit's test under § 1125(a)(1)(A). *See Id*. §§ 21-23. The Third Restatement also requires, with limited exceptions, a likelihood of confusion for an anti-dilution claim. *Id*. § 25. Because the Court found Simpson's websites did and do not cause a likelihood of confusion, the Board's common law trademark infringement and anti-dilution claims fail.

### 3.    Misappropriation

The Board also alleges misappropriation. The Third Restatement limits misappropriation claims to only those involving the misappropriation of trade secrets, right of publicity, breach of contract, common law copyright infringement, or a statute or international agreement.[13] Restatement (Third) of Unfair Competition § 38. Furthermore, this Court is unaware of any statute or case law recognizing a cause of action for misappropriation of a trademark in the Virgin Islands. Moreover, many courts and scholars do not believe the doctrine of misappropriation should be extended to trademarks because it would undermine the likelihood of

---

[12] Section 20 states that one is "subject to liability for infringement of another's trademark [or] trade name . . . if . . . the actor uses a designation that causes a likelihood of confusion . . . ." Restatement (Third) of Unfair Competition § 20.

[13] Section 38 provides one "who causes harm to the commercial relations of another by appropriating the other's intangible trade values is subject to liability to the other for such harm *only* if: (a) the actor is subject to liability for an appropriation of the other's trade secret . . . or (b) the actor is subject to liability for an appropriation of the commercial value of the other's identity . . . or (c) the appropriation is actionable by the other under federal or state statutes or international agreements, or is actionable as a breach of contract, or as an infringement of common law copyright as preserved under federal copyright law." Restatement (Third) of Unfair Competition § 38 (emphasis added).

confusion showing required of trademark infringement claims. *See* McCarthy, *supra*, § 10:72. ("Misappropriation doctrine should not be used in ordinary trademark infringement cases to short-circuit trademark law's carefully crafted standards of protection."); *see also Duffy v. Charles Schwab & Co., Inc.*, 97 F. Supp. 2d 592, 598 n.2 (D.N.J. 2000) ("No cause of action exists for misappropriation of a trademark.") (citing McCarthy, § 10:72, at 10–136). Therefore, the Board's misappropriation claim also fails.

### 4.       Tortious Interference

The Board also alleges tortious interference. The Second Restatement of Torts only recognizes three causes of action for tortious interference: (1) intentional interference with performance of contract by a third person; (2) intentional interference with another's performance of his own contract; and (3) intentional interference with prospective contractual relations. Restatement (Second) of Torts §§ 766-766B (1979). According to the Amended Complaint, Simpson has interfered with and induced an interference with the business and personal relationships the Board has with its condominium owners, trade suppliers, the business community, the general public, and others. Am. Compl. ¶ 36. The Board also alleges Simpson tortiously interfered with its contracts, but failed to identify a single existing or prospective contract with which he interfered. *Id*. ¶ 38. The Board has also failed to prove any pecuniary harm or loss, as required by the Second Restatement. Restatement (Second) of Torts §§ 766-766B. Accordingly, the Board's tortious interference claim fails.

## CONCLUSION

For the reasons set forth above, the Court concludes Simpson's websites are not commercial in nature and therefore do not violate the Lanham Act. The Court also concludes even if Simpson's websites were commercial in nature, the Board has failed to show the websites

cause or caused a likelihood of confusion or actual deception, and the Board's mark is not famous as defined by the TDRA. Likewise, the Board has failed to prove the necessary elements of its Virgin Islands claims. Therefore, the Board is not entitled to injunctive relief or damages and judgment will be entered in favor of Simpson and against the Board on all counts.

An appropriate Judgment follows.

BY THE COURT:

/s/ Juan R. Sánchez
Juan R. Sánchez, J.